684 A.2d 888

**MAYOR AND CITY COUNCIL OF BALTIMORE**

v.

**The NEW PULASKI COMPANY LIMITED PARTNERSHIP.**

**No. 168, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Nov. 8, 1996.

Kathryn E. Kovacs, Assistant Solicitor (Neal M. Janey, City Solicitor and Burton H. Levin, Principal Counsel, on the brief), Baltimore, for Appellant.

Thomas G. Garrison and Karin Marie Kendrick, Baltimore, for Amicus Curiae, Baltimore Recycling Coalition, Inc.

Roger W. Titus (Thomas P. Perkins, III, C. Carey Deeley, Jr., Mitchell Y. Mirviss, Kevin B. Collins and Venable, Baetjer and Howard, L.L.P., on the brief), Rockville, for Appellee.

Argued before DAVIS, HARRELL, and EYLER, JJ.

DAVIS, Judge.

On January 5, 1996, the Circuit Court for Baltimore County issued a judgment declaring City of Baltimore Ordinance No. 128 of the 1992 Councilmanic Session preempted by State environmental laws. The court granted summary judgment in favor of appellee The New Pulaski Company Limited Partnership, and the Mayor and City Council of Baltimore appealed.

The principal issue presented for our review is restated as follows:

**Whether Ordinance No. 128 is preempted
by State environmental laws.**

## FACTS

The New Pulaski Company Limited Partnership (Pulaski) owns and operates a solid waste incinerator (Incinerator) located on Pulaski Highway in Baltimore City. Baltimore City (City) built the Incinerator in 1956 and owned and operated it until 1981 when the City sold the Incinerator to Pulaski.

Pulaski and the City entered into a Waste Disposal Service Agreement (WDSA) on May 6, 1981 for a term of fifteen years whereby Pulaski would dispose of municipal waste. In addition, the City retained three five-year options to renew the WDSA. Upon expiration of the WDSA, Pulaski would own the Incinerator for the remaining period of a fifty-year Ground Lease and be responsible for operating costs. During the term of the WDSA, however, the City was responsible for one hundred percent of the operating, maintenance, and improvement costs. In 1985, the WDSA was amended to reduce the City's responsibility to eighty-five percent of the costs and to permit Pulaski to build a fifth furnace at the Incinerator.

In January 1993, Pulaski and the Maryland Department of the Environment (MDE) entered into a Consent Order to establish a compliance schedule for the Incinerator's air emissions. On May 11, 1994, MDE issued another Order to Pulaski directing Pulaski to take remedial action to bring the air quality emissions of the Incinerator into compliance with the air pollution laws and regulations. The City estimated that in order to bring the Incinerator into compliance, the cost of retrofitting the Incinerator would be $60–$100 million.

According to the WDSA, Pulaski was required to notify, and obtain approval from, the City for all improvements to the Incinerator. In a May 8, 1992 letter from George G. Balog, the Director of the Department of Public Works (Director or Public Works), the City stated that it was not "practical or

technically competent to take any action to retro-fit" the Incinerator, and the City would not reimburse Pulaski for any expenses taken to retrofit the Incinerator. Based on the Director's assessment, Pulaski recommended that a new solid waste, waste-to-energy facility be built. Pulaski claims that public opposition to the proposed waste-to-energy facility existed, and as a result, Bill No. 54, which places a moratorium on new incinerators, was introduced at a session of the City Council. On July 18, 1992, Bill No. 54 passed and became effective on August 7, 1992 as Ordinance No. 128 (the Moratorium).

The Moratorium prohibits the construction, reconstruction, replacement, and expansion of incinerators within Baltimore City for a period of at least five years. If the City does not reach its goal of recycling forty percent of its solid waste by 1997, the Moratorium will automatically be renewed for another five years or until the City reaches its recycling goal. The ostensible purpose of the Moratorium, provided in § 1 of the law, is to allow the development and implementation of environmentally sound alternatives to burning solid waste, such as recycling, source reduction, and composting. The Moratorium also states that developing these alternatives will help the State achieve its mandated recycling goals and benefit the health and welfare of the residents of Baltimore City.

The Moratorium provides a narrow exemption to the ban on incinerators "if the Director of Public Works certifies in a written report . . . that such construction, replacement or expansion is necessary to serve the public interest in the efficient, economic, safe and environmentally sound disposal of solid waste, the City Council by ordinance may approve such construction, reconstruction, replacement or expansion." The Moratorium also provides in § 3b that "[n]othing contained herein shall abrogate any permittee's responsibility to comply with local, state or federal laws relating to pollution controls and any construction, reconstruction, improvement or replacement necessarily associated therewith."

Thus, Pulaski sought certification to construct a new incinerator from Balog. On May 5, 1994, Balog certified to the City Council that it was his opinion that the new Pulaski incinerator was necessary to serve the public interest in the efficient and environmentally sound disposal of solid waste. Bill No. 846 was introduced in the City Council to lift the Moratorium for Pulaski, but it was not approved.

Pulaski, believing that the City's actions in refusing to pay to retrofit the Incinerator and banning construction of a replacement incinerator deprived Pulaski of "any realistic means of complying with the MDE Orders," sued the City in December 1993 for breach of the WDSA and for illegally enacting the Moratorium. Pulaski voluntarily withdrew its complaint in January 1994. The parties entered into a Settlement Implementation Agreement (SIA) on May 3, 1996 that terminated the WDSA. The SIA relieved the City of its obligation to pay eighty-five percent of the operating costs and extended Pulaski's ground lease until 2071. On June 23, 1995, Pulaski brought an action for declaratory judgment in the Circuit Court for Baltimore County to strike down the Moratorium.

In accordance with MD.CODE ANN., ENVIR. § 9–503, on July 21, 1995, the City submitted its 1994–2004 Solid Waste Management Plan (SWMP) to MDE. The SWMP states the City's goals and plans for solid waste management. In the SWMP, reference is made to the Moratorium. MDE approved the SWMP on October 18, 1995, finding that the plan satisfies MDE's requirements and guidelines as stated in COMAR 26.03.03.

On December 22, 1995, the lower court granted summary judgment in favor of Pulaski with respect to its action for declaratory judgment, and concluded that "the Moratorium is preempted by state law." The court did not decide any of the other grounds raised by Pulaski for invalidating the Moratori-

um.[1] The trial court entered a declaratory judgment on January 5, 1996, declaring the Moratorium null and void. The City appeals from the lower court's judgment.

## DISCUSSION

The only issue that the City raises on appeal is whether the Moratorium is preempted by State law. The amicus curiae,[2] however, raises two additional issues: 1) whether the trial court lacked jurisdiction to issue a declaratory ruling because Pulaski released the right to bring this action in the SIA; and 2) whether the trial court lacked jurisdiction to declare the moratorium void because Pulaski failed to exhaust its administrative remedies. The trial court decided these issues in favor of Pulaski on summary judgment.

As a general rule, we do not consider an issue raised by an amicus if no party to the case raises it. *Eagle–Picher Industries, Inc. v. Balbos,* 326 Md. 179, 231 n. 15, 604 A.2d 445 (1992); *Md.–Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 15 n. 6, 511 A.2d 1079 (1986). When, however, the matters raised by the amicus relate to primary jurisdiction and exhaustion of remedies, there is an exception to this rule, and we address those issues *nostra sponte* when appropriate. *Id.* Whether Pulaski released its right to bring this action is an affirmative defense pursuant to MD. RULE 2–323(g) (1996). Thus, we do not review the issue of release because it is not an issue of primary jurisdiction and was not raised by the City on appeal. We, however, will address the exhaustion of remedies issue raised by the amicus.

---

1. Pulaski also asserted that the Moratorium's adoption: (1) was not within the City Council's authority under the City Charter; (2) was in violation of the due process provisions of the federal and State constitutions; and, (3) granted an exception to which Pulaski was entitled.

2. The amicus curiae, Baltimore Recycling Coalition, Inc., is a not-for-profit organization that promotes environmentally sound solid waste management alternatives such as source reduction and recycling.

We hold that the trial court had proper jurisdiction to declare the Moratorium void. Pulaski exhausted any administrative remedies available to it, pursuant to the Moratorium, by seeking certification from the Director of Public Works and approval from the City Council for the new incinerator. The amicus argues that the City should have sought a declaratory ruling from MDE on the Moratorium before seeking judicial review, pursuant to MD.CODE ANN., STATE GOV'T §§ 10–304, 10–305 (1995). The amicus also asserts that Pulaski should have requested that MDE amend the SWMP to include a new incinerator pursuant to its authority under MD.CODE ANN., ENVIR. § 9–503 (1996). The exhaustion rule requires that "where a statute provides a special form of remedy the plaintiff must use that form of remedy rather than any other." *Soley v. State Comm'n on Human Relations,* 277 Md. 521, 526, 356 A.2d 254 (1976). Neither of the statutes cited by the amicus requires Pulaski to pursue any remedy with MDE before seeking judicial relief. Section 10–304 states that "[a]n interested person may submit to a unit a petition for a declaratory ruling with respect to the manner in which the unit would apply a regulation or order of the unit...." MD.CODE ANN., STATE GOV'T § 10–304. The Moratorium and the SWMP are not orders or regulations of MDE. In addition, although MD.CODE ANN., ENVIR. § 9–503 gives MDE the authority to compel a county to amend its SWMP's, it does not provide a means of remedy for Pulaski. Pulaski sought the only "special form" of remedy available to it under the Moratorium, which was to seek an exemption to the ban on incinerators by applying to the Director of Public Works for a certification and seeking the approval of the City Council.

In addition, the amicus contends that Pulaski's claims were not justiciable because Pulaski had not submitted to MDE or the City a detailed plan to build a new incinerator, and thus, there is no actual claim or controversy. We disagree. We are not required, nor should we use our judicial

discretion, to "refuse a declaratory judgment merely because it may be preliminary to further litigation, if it terminates and decides the particular legal question at issue." *Kronovet v. Lipchin*, 288 Md. 30, 59, 415 A.2d 1096 (1980) (citing *Commissioners of Cambridge v. Eastern Shore Public Serv. Co.*, 192 Md. 333, 341, 64 A.2d 151). Thus, the trial court had jurisdiction to determine whether the Moratorium was null and void. We now turn to the City's only issue on appeal: whether the Moratorium is preempted by State environmental laws.

The Court of Appeals stated the doctrine of preemption as follows:

> The doctrine of pre-emption [sic] is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted [sic] field. Pre-emption [sic] may be accomplished either expressly by statutory language prohibiting local legislation, . . . or impliedly, by other unequivocal conduct of the General Assembly. . . . In either case, the focus of the inquiry must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field.

*Ad + Soil, Inc. v. County Comm'rs*, 307 Md. 307, 324, 513 A.2d 893 (1986) (citations omitted). In addition, the Court has considered secondary factors in determining whether preemption by implication exists:

> 1) whether local laws existed prior to the enactment of the state laws governing the same subject matter; 2) whether the state laws provide for pervasive administrative regulation; 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed; 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances; 5) whether a state agency responsible for administering and enforcing the state law has recognized

local authority to act in the field; 6) whether the particular aspect of the field sought to be regulated by the local government has been addressed by the state legislation; and 7) whether a two-tiered regulatory process existing if local laws were not pre-empted [sic] would engender chaos and confusion.

*Allied Vending, Inc. v. Bowie,* 332 Md. 279, 299–300, 631 A.2d 77 (1993) (citations omitted) (the State licensing scheme for cigarette vending machines preempted local ordinances regulating the placement of vending machines).

 In the case at bar, the court found the Moratorium impliedly preempted by Maryland's environmental statutory schemes under MD.CODE ANN., ENVIR. § 9 and related regulations, and granted summary judgment in favor of Pulaski. The standard of appellate review of a grant of summary judgment is whether the trial court was legally correct. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993) (citing *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990)). "Determining whether state legislation impliedly preempts local enactments ... involves assessing whether State regulations have so thoroughly and pervasively covered the subject as to completely occupy the field, and whether the subject requires uniform state-wide treatment." *Holmes v. Maryland Reclamation Associates, Inc.,* 90 Md.App. 120, 143–144, 600 A.2d 864, *cert. dismissed sub. nom. County Council v. Maryland Reclamation Associates,* 328 Md. 229, 614 A.2d 78 (1992). It is undisputed by the parties that the particular field of concern is solid waste management. We agree that the environmental statutory schemes show a legislative intent comprehensively to occupy the field of solid waste management, and thus, preempt by implication the City's enactment of the Moratorium banning solid waste incinerators.

The City contends that the Moratorium is not preempted by State environmental laws, but that the extensive statewide legislation in the field of solid waste management "manifests a general policy of fostering local control under state supervi-

sion." The City argues that the statutory schemes of Title 9, Subtitles 2 and 5 do not comprehensively occupy the field of solid waste management to preempt the City Moratorium. Rather, the City asserts that these provisions are evidence of the intent to have local legislative involvement in the solid waste management field. Moreover, the City posits that the statutory provisions relating to air and water quality do not pertain to the field of solid waste management, and thus, do not preempt the Moratorium.

We begin our analysis by examining the two statutory schemes, Title 9, Subtitles 2 and 5, cited by the City on appeal. These two statutory schemes are pertinent to solid waste management because they illustrate MDE's exclusive authority over the issuance of permits required to install or alter incinerators, and MDE's control over SWMP's of the political subdivisions of the State. Although these statutes provide for the City's [3] involvement in the permitting and planning of solid waste management, these entities operate under the close regulation of MDE. The instant case is similar to *Holmes v. Maryland Reclamation Associates, Inc.*, 90 Md.App. at 150, 600 A.2d 864. In *Holmes,* we held that these two statutory schemes preempted Harford County from enacting legislation that eliminated a solid waste disposal facility from its SWMP. *Id.* The Court stated that the legislative intent of the statutory schemes under Title 9, Subtitles 2 and 5 was "to reserve to MDE the specific subject matter governing the decision to issue permits to solid waste management facilities and to relegate to counties a restricted role in planning." *Id.* at 149, 600 A.2d 864.

The statutory scheme under Title 9, Subtitle 2 relates to the issuance of permits to solid waste management facilities. The Court in *Holmes* examined MDE's authority under Title 9, Subtitle 2 to regulate solid waste management through the

---

3. The pertinent statutes refer to the role of the "county." We track the language of the legislation with the understanding that "county" simply refers to the subdivision involved, including Baltimore City. The definition of "county" as used in the ENVIRONMENTAL ARTICLE includes Baltimore City. MD.CODE ANN., ENVIR. § 1–101(c).

issuance of permits and concluded that the county's power to issue permits is minimal. MDE is vested with exclusive authority to issue permits for the installation, alteration, or expansion of incinerators. MDE has promulgated regulations regarding the issuance of permits for refuse disposal systems, which include incinerators. COMAR 26.04.07.25. Pursuant to § 9–204.1, MDE may not issue a permit to "install, materially alter, or materially extend" an incinerator unless the county has a recycling plan that has been approved by MDE. According to § 9–210, in order for MDE to issue a permit, the facility must also meet all applicable county land use and zoning requirements. These provisions illustrate MDE's exclusive authority in the issuance of permits for solid waste facilities.

The City argues that the Moratorium is a land use requirement pursuant to § 9–210(a)(3); however, it provides no support for this contention. Although the Moratorium is mentioned in the 1994–2004 SWMP which was approved by MDE, it does not follow that the Moratorium is a land use requirement, or that the State endorsed the Moratorium. Moreover, even if the Moratorium is categorized as a land use requirement, it may nevertheless intrude upon an occupied field of State law. *Talbot County v. Skipper,* 329 Md. 481, 489–91, 620 A.2d 880 (1993) (Title 9, Subtitle 2 relating to sewage sludge utilization was sufficiently comprehensive to preempt by implication a local ordinance regulating the application of sewage sludge). Thus, the City's argument does not change the fact that the State comprehensively occupies the field of the permitting process for solid waste facilities.

In addition, we agree with the trial court's conclusion that pursuant to Title 9, Subtitle 5, the "General Assembly has vested final authority in MDE to review, approve, and demand revisions of all proposed county plans." In *Holmes,* the Court held "the county's role in developing a[n] SWM Plan is limited, and closely supervised by MDE." *Holmes,* 90 Md.App. at 150, 600 A.2d 864; *see also Howard County v. PEPCO,* 319 Md. 511, 573 A.2d 821 (1990) (statutory provision vesting the Public Service Commission with "final authority" over construction permits for power transmission lines preempted zoning ordi-

nances regulating the location and construction of such transmission lines). Subtitle 5 requires counties to review the plan and allows them to initiate revisions, but MDE retains final authority to require the county to revise or amend its plan. MD.CODE ANN., ENVIR. § 9–503(c). In addition, the statute provides that the county must provide a hearing and notice before adopting revisions or amendments to its plan. MD. CODE ANN., ENVIR. § 9–503(d). MDE has also promulgated detailed regulations regarding the contents of the SWMP's. COMAR 26.03.03.03. "[T]hese provisions indicate MDE's strong control over county plans, including its ability to modify or veto plans or amendments of which it does not approve." *Holmes,* 90 Md.App. at 151, 600 A.2d 864.

The City, however, argues that the statutory scheme relating to solid waste management plans under Title 9, Subtitle 5 is evidence of the legislative purpose not to prohibit local legislation. The City points to § 9–503, which requires each county to have an SWMP that is approved by MDE. The contents of the SWMP, as prescribed by COMAR 26.03.03.03 and MD.CODE ANN., ENVIR. § 9–505, require that the SWMP contain a statement of the political subdivision's goals and plans regarding solid waste management. Although the statutory scheme under this Subtitle, like Subtitle 2, requires local involvement, we do not believe that the State intended to vest the localities with legislative authority. To the contrary, the statute illustrates that even when the State has mandated local involvement through the submission of county plans, it provides detailed regulations on the contents of the plans and retains the authority to veto or require modification of the plans. *See* MD.CODE ANN. §§ 9–503 and 9–507; COMAR 26.03.03.

The City also contends that § 9–502(c) contains a reverse preemption provision. That section provides that "[a]ny rule or regulation adopted under this subtitle does not limit or supersede any other county, municipal, or State law, rule, or regulation that provides greater protection to the public health, safety, or welfare." This section does not apply to the Moratorium involved in the instant case. In addition, we

stated in *Holmes* that "[s]ection 9–502(c) does not operate to allow a county to veto state law." *Holmes,* 90 Md.App. at 147 n. 13, 600 A.2d 864. The Moratorium usurps the State of its exclusive authority over county plans and the relevant permitting process. Moreover, *Holmes* suggests that § 9–502(c) applies only to land use planning and zoning ordinances. *Id.*

In our view, the two statutory schemes under Title 9, Subtitles 2 and 5 indicate an intent of the General Assembly comprehensively to occupy the field of solid waste management. In addition, we find further support for preemption by implication by examining the secondary factors outlined in *Allied Vending, Inc.,* 332 Md. at 300, 631 A.2d 77. We already addressed several of these factors throughout our opinion. We examine the secondary factors more specifically below and find further support for our conclusion that the Moratorium is preempted by State environmental laws.

The first factor asks whether there was a pre-existing local law at the time the State law was enacted. Although the solid waste disposal facility permit scheme does not specifically address local legislation, the Moratorium was not a pre-existing local law. Section 9–502(c) of the planning scheme provides that any rule or regulation adopted by MDE does not supersede any local ordinance providing for greater protection of the public health. This section, however, as discussed previously, does not indicate the intent of the General Assembly to permit temporary or permanent moratoria on methods of solid waste disposal. In addition, pervasive administrative regulation exists in the field of solid waste management which indicates the General Assembly's intent to delegate pervasive authority to MDE in the area of solid waste management. *See* COMAR 26.04.07, 26.03.03. We also conclude that a ban on incinerators is not a traditional area of regulation controlled by local government, except for legitimate zoning and planning reasons. In addition, the State laws do not expressly provide concurrent legislative authority to the City, but, in fact, expressly state that MDE has final authority over the issuance of permits and approval of county solid waste management plans.

Moreover, the State has not recognized the City's authority to act unilaterally in the field of solid waste management. In the instant case, MDE went on record to oppose the Moratorium. In a letter to Mary Pat Clarke, President of the Baltimore City Council, MDE stated that Maryland law requires each jurisdiction to provide adequate disposal of municipal waste and "establishing a moratorium on any one of [the] alternative systems places unnecessary constraints on the City to properly manage its solid waste." Letter from Robert Perciasepe, Secretary, Maryland Department of Environment, to Mary Pat Clarke, President, City Council of Baltimore (March 25, 1992).

Turning to the last two secondary factors, we conclude that the construction or alteration of new incinerators is expressly delegated to MDE. *See* MD.CODE ANN., ENVIR. §§ 9–204, 9–204.1, 9–210. Finally, under the last of the secondary factors, the City contends that the Moratorium does not foster a two-tier regulatory process that would engender chaos and confusion. The Moratorium, it contends, does not completely prohibit the construction of incinerators but instead places conditions on the construction. We conclude that the Moratorium essentially establishes a veto over State decisions to permit or compel the installation or alteration of incinerators and a veto over the SWMP approval process which would cause confusion and frustrate State policy. The State does not intend that counties have a veto power in the area of solid waste management. This is evident from the General Assembly's 1988 amendment to § 9–210 which eliminated local veto power over the construction of solid waste acceptance facilities. *Holmes,* 90 Md.App. at 153, 600 A.2d 864. After considering the primary and secondary factors, as set forth in *Allied Vending Inc.,* we conclude that the Moratorium is impliedly preempted by state environmental law.

Furthermore, the cases relied on by the City, *Ad+Soil, Inc.,* 307 Md. 307, 513 A.2d 893 (the then-statutory scheme relating to sewer sludge did not preempt local zoning ordinance because of the references to concurrent local legislative authority) and *Holiday Point v. Anne Arundel Co.,* 107 Md.

App. 160, 666 A.2d 1332 (1995), *cert. granted* 341 Md. 719, 672 A.2d 659 (1996) (county zoning ordinance limiting the construction of marinas within a certain distance from shellfish beds was not impliedly preempted by laws regulating water quality or shellfish protection) differ from the instant case and *Holmes.* The statutory schemes examined in the cases cited by the City did not comprehensively occupy the field at issue.

We conclude that Title 9, Subtitles 2 and 5 comprehensively occupy the field of solid waste management and preempt by implication the Moratorium on incinerators. The Moratorium intrudes on the State's power to regulate and issue permits in the area of solid waste management by unilaterally banning the construction of new incinerators. Because we hold that the Moratorium is preempted by Title 9, Subtitles 2 and 5, we do not address the City's argument that the lower court erred in concluding that two additional statutes pertaining to air and water quality vest comprehensive authority in the General Assembly and preempt the Moratorium.

■ In addition, the City, in its reply brief, argues for the first time that the lower court erred in defining the field at issue as "solid waste management." The City argues that although the ordinance concerns the field of solid waste management, it more specifically concerns solid waste management planning. This issue was not raised by the City in its original brief nor does it come in response to any argument raised by Pulaski; thus, we do not address this argument. *Oaks v. State,* 83 Md.App. 1, 11, 573 A.2d 392 (1990) (The Court concluded that appellant abandoned an issue when he did not discuss it in his original brief, and thus, the Court refused to address the issue when raised by appellant in his reply brief). In the case at bar, the City specifically states in its original brief that solid waste management is the field of concern involved in this case. The function of the reply brief is limited to responding to points and issues raised in appellee's brief which, in turn, addresses issues originally raised by appellant. *Federal Land Bank, Inc. v. Esham,* 43 Md.App.

446, 459, 406 A.2d 928 (1979) ("To allow new issues or claims to be injected into the appeal by a reply brief would work a fundamental injustice upon the appellee, who then would have no opportunity to reply to new issues asserted against them.").

Finally, appellee suggests that we consider alternative grounds for invalidating the Moratorium even though the lower court did not decide these issues (*see* n. 1 *infra* at 224). The Court of Appeals and this Court have discretion to consider issues that were not decided by the trial court but are raised on appeal if review of the issues would avoid expense and delay. MD. RULE 8–131(a) (1996). *Id.* We do not believe it would be desirable in the instant case to address these issues without them first having been examined by the trial court. *See Carrier v. Crestar Bank, N.A.,* 316 Md. 700, 561 A.2d 227 (1989).

Thus, we affirm the judgment of the trial court and find that Ordinance No. 28, the Moratorium, is preempted by implication by MD.CODE ANN., ENVIR. Title 9, Subtitles 2 and 5.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**